## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIM. NO. 10-719 |
| RICHARD SOMMERS, | : | |
| Defendant | : | |

## DEFENDANT'S SENTENCING MEMORANDUM

**To The Honorable C. Darnell Jones, II, United States District Court of the Eastern District of Pennsylvania:**

Richard Sommers, by his attorneys, Sara M. Webster and Walter S. Batty, Jr., submit this Sentencing Memorandum in aide of sentencing scheduled for August 5, 2013:

### I.    HISTORY OF THE CASE AND CHARGES:

An undercover drug investigation was conducted at the Boeing Helicopter Plant in Ridley Park as a result of which the defendant on three occasions delivered to a cooperating individual the following:

   a) Count 1 - on 5/25/10-20 (8 mg) pills of Suboxone for $200.00 at the Boeing Plant;
   b) Count 2 - on 5/28/10- 11 (8 mg) pills of Suboxone for $110.00 at a WaWa in Media; and
   c) Count 3 - on 6/22/10- 22 (8 mg) pills of Suboxone for $200.00 at the Boeing Plant.

The delivery of Suboxone which contains Buprenorphine, a Schedule III drug, was in violation of 21 U.S.C. §841 (a)(1), (b) (1) (E).

On September 29, 2011, he was arrested and released on ROR bail.

On March 12, 2012, the defendant and counsel met with DEA, FBI and he disclosed the history of his addiction and involvement in the sale of controlled substances at the Boeing Plant. He accepted full responsibility for his illegal acts and explained how and where he obtained prescriptions. He did not cooperate in the prosecution of other individuals.

On November 28, 2012, he entered an open guilty plea on all three Counts.

## II.    FAMILY

For the Court's consideration with respect to the sentencing factors in 18 U.S.C. §3553 (a) the defendant provides the following information about his history and his character.

Richard Sommers was born and raised in Delaware County by two loving and supportive parents. There is no criminal history among his parents or his four siblings. The family lived a block from the neighborhood school where the defendant was an avid participant in sports and a fairly average student.

After graduating from Sun Valley High School he married and had two children. Following his arrest, the couple divorced after 18 years of marriage although they remain friends and devoted to the raising of their two boys.

The focus of Richard's life is his 14 and 16 year old sons. He shares custody with their mother and during the summer months he has one or the other boy full time. While the parents switch off every other week during the summer, during the school year he has both boys from Friday after school until he takes them to school Monday morning.

The defendant describes himself as "Mr. Mom." Anytime not at work is spent with them. As a parent in this day in age he has learned to play their video games with them, they ride bikes together, play sports and swim at his employer's pool. They are keen on watching movies together and comfortable just hanging out in the three bedroom home that he shares with his twin

brother, his nephew and a friend. The household is a supportive and loving environment for all, especially his sons.

## III.   EMPLOYMENT

The defendant worked at Boeing as a sheet worker for 24 years. Following the loss of his position at Boeing, he is working at Hollywood Landscaping full-time. He hopes for a better job once this case is resolved. During the summer months he is required to work 6 and 7 days a week from early in the morning until afternoon. He earns $12.00 an hour which barely covers his living expenses.

## IV.   DRUG AND ALCOHOL

In 1998, he injured his back lifting weights. He was originally prescribed various pain medication but eventually started buying drugs off the street.

In 2008, Sommers tested positive for opiates at Boeing. He was admitted to the Boeing "Last Chance Program" which included 10 days inpatient drug and alcohol treatment, outpatient and regular testing. The treatment gave him insight into his dependence on opiates and gave him strength to address the problem head on. However, he continued to be prescribed Suboxone. At the time of his arrest he was using 16 milligrams (2 pills) of Suboxone a day. Today he is completely drug free having weaned himself off the Suboxone.

## V.   SENTENCING GUIDELINES

Base offense level. According to the Pre-Sentence Report (PSR), to which neither the government nor the defendant made any objections, the offense level for Counts 1, 2, and 3 is level 4. This computation was made pursuant to section 2D1.1(a)(17) of the Sentencing Guidelines, after utilizing the conversion table to calculate that the 53 tablets of Buprenorphine

for which Sommers was responsible were the equivalent of 0.053 kilograms of marijuana. Based on this amount of marijuana, the base offense level is 6.

Adjustment for acceptance of responsibility. Pursuant to section 3E1.1(a), the base offense level was reduced by 2 levels because Sommers had accepted responsibility for the offense by his admission concerning the three counts in the indictment during the guilty plea colloquy.

Total offense level. After the downward adjustment of 2 levels, the offense level is 4.

Criminal history category. Sommers has 0 criminal history points, which gave him a criminal history category of 1.

Guideline level. The guideline level for imprisonment, taking together an offense level of 4 and a criminal history category of I, is 0 – 6 months imprisonment.

## VI.    THE GOVERNMENT'S MOTION FOR AN UPWARD VARIANCE

In the companion case of United States v. Corcoran, Criminal No. 10-721, the government filed an extensive Motion for Variance (Gov. Motion) describing the reasons why it was seeking an upward variance of 2 levels. Sommers expects that the government will file a similar motion against him as well as the rest of the 23 "Boeing defendants," as the government refers to the defendants charged with felonies. Gov. Motion at 3.

Specifically, the government argued in its motion that the "criminal activity [of each of the 23 'Boeing defendants' including] this defendant, posed a specific and significant threat to society." Gov. Motion at 2. The government argued that

> such a variance is appropriate under several of the 3553(a) factors, including the nature and circumstances of the offense; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and the need to afford adequate deterrence to criminal conduct.

*Ibid.*

The government apparently argues that all 23 of the "Boeing defendants" should receive an upward variance of 2 levels because the plant at which they were working is one which manufactures military aircraft.

Government's rationale. The government argues that

[t]he general deterrent effect of a sentence is an appropriate consideration in choosing a reasonable sentence. As the courts of appeals have held both before and after Booker, deterrence under Section 3553(a) is not limited to deterrence of the particular defendant.

Gov. Motion at 3 n.1. Sommers agrees with the government that general deterrence is an appropriate factor for this Court to consider, but maintains that the cases cited by the government are inapposite here.

The government cites four cases for its argument that general deterrence is a valid consideration under 18 U.S.C. §3553(a)(2)(B). Gov. Motion at 3 n.1. Sommers, of course, has no issue with this argument, but notes that the cases cited by the government have no apparent applicability to his case, because they do not involve motions for upward variances where the government asserted that there was a risk of harm.[1]

Medication. Sommers pled guilty to three counts of distributing Suboxone tablets to a cooperating witness (referred to in the PSR as the "CS.") The ingredient in this medication which is a scheduled substance is Buprenorphine. Sommers has reviewed the government's

---

[1] United States v. Eura, 440 F.3d 625, 638 (4th Cir. 2006)(concurring opinion), rev'd on other grounds, 552 U.S. 1090 (2008), considered the totally unrelated issue of the crack cocaine/powder cocaine ratio. Likewise, United States v. Jordan, 435 F.3d 693, 698 (7th Cir. 2006), considered the totally unrelated issue of an upward variance against a defendant convicted of traveling in interstate commerce to engage in sexual act with a juvenile, based on aggravating circumstances, a heightened risk of recidivism, and the need for general deterrence. United States v. Glover, 431 F.3d 744, 751 (11th Cir. 2005), concerned the totally unrelated issue of a defendant who had been convicted of being a felon in possession of a firearm and who argued that his sentence violated the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), because the district court treated the Sentencing Guidelines as mandatory rather than advisory.

motion for an upward variance in a case where Buprenorphine was involved, <u>United States v. Highley</u>, Crim. No. 10-194. Sommers acknowledges that there can be deleterious effects of abusing such a medication, depending on the circumstances of individual situations. At the sentencing hearing, Sommers will make an offer of evidence that Suboxone is much less toxic than some of the other medications, such as Oxycontin, with which other defendants were involved.

    <u>Prescription drug abuse as a ground for a group upward variance</u>. Sommers agrees with the government that "prescription drug abuse is a rampant national and local problem." Gov. Motion at 5. But this observation is not a basis for arguing that there should be an across-the-board upward variance of 2 levels in this case. Rather, the government's analysis could properly be directed to the Sentencing Guidelines Commission, so that it could consider whether, for example, the guidelines should include an upward adjustment for distribution of a controlled substance in a facility manufacturing military equipment, similar in theory to sections 2D1.1(b)(4), which authorizes a 2-level upward adjustment for distributions taking place inside a correctional facility. Moreover, the government's analysis could properly be directed to the Congress, which could enact statutes, and/or to the military, which could impose regulations based on the rationale of such statutes as the schoolyard and playground statutes in federal narcotics cases. *Cf.* 21 U.S.C. §860(a).

    As with the government's references to general deterrence as being a factor for the sentencing here, the government has once again cited cases which do not pertain to the issue of the motion for an upward variance here.[2] Gov. Motion at 6.

_____

[2] In <u>United States v. Marty</u>, 450 F.3d 687, 690 n.4 (7th Cir. 2006), there was no mention of an upward variance. Rather, the issue was the accuracy of the sentencing court's determination that the defendant was responsible for a particular quantity of Oxycodone pills and its equivalency in

After its many references to the significance of the problem of abuse of prescription medications, the government's argument that "[t]here is very low social disapproval" of such abuse of medication, and "the prescription drug problem continues to grow because our society keeps underestimating its seriousness," Gov. Motion at 7-8, aims at the wrong target. Instead, as noted above, the government is really taking issue, on an across-the-board basis, with the Sentencing Guidelines themselves or with the absence of targeted legislation, rather than providing grounds for a standardized upward variance.

The government also misdirects its aim when it argues that. "[c]ombating prescription drugs drains law enforcement resources because '[d]rug diversion investigations can be complex and take many months.'" Gov. Motion at 8-9 (citation omitted). While that assertion is certainly an accurate one, and while the previous absence of a provision in the contract between Boeing and the union permitting tests of employees for prescription medications may have been an important factor leading to the intervention of federal law enforcement, it does not follow that this is a valid ground for an across-the-board 2-level upward variance. If that were the case, then there should likewise be upward variances in other cases, depending on the time and resources federal investigators would require to obtain indictments in other cases.

In any event, it is the government's burden to show, on an individualized basis, that an upward variance in the cases against Sommers is appropriate. When the government states that it intends to file motions for upward variances in all of the 23 Boeing defendant cases, it is asking

kilograms of marijuana. Likewise, in United States v. Purdue Frederick Co., Inc., 495 F.Supp.2d 569, 576 (W.D. Va. 2007), also cited by the government, Gov. Motion at 6-7, there was no mention of an upward variance. The issue in that case was rather whether the district court should accept guilty pleas by a pharmaceutical company and by its officers to misbranding offenses, despite the limitations on the court's discretion in the plea agreements. Again, in McCaulley v. Purdue Pharma, L.P., 2002 WL 398715, at *1 (W.D. Va. 2002), also cited by the government, Gov. Motion at 7, there was no consideration of a motion for upward variance in that it was not a criminal case.

for these variances for a group of defendants, even though they were not charged as co-conspirators or with aiding and abiding each other. It is axiomatic that sentencing is to be done on an individualized basis. The government has not cited any case which supports a group upward variance of 2 levels, and Sommers is not familiar with any such case.

"Threat to society" at the Boeing plant. The government's core argument is that, "Prescription drug abuse by workers on the Boeing ... Ridley Park campus poses a specific and significant threat to society." Gov. Motion at 9. While it is certainly true that any defective military aircraft presents a potential threat to the safety of those members of the military who flew in those aircraft, the government's evidence at the sentencing hearing in front of Magistrate Judge Timothy R. Rice showed that there were no manufacturing defects of note in the V-22 Osprey aircraft or in the Chinook helicopters which were built at the Ridley plant. *See* Tr. 7/23/12 at 171, 187-88 (testimony of Bernard Jones, Director of Operations, Boeing Military Aircraft). In fact, Jones did not identify any manufacturing defects at all in these two aircraft. While Sommers regrets abusing Buprenorphine, among other things, and regrets distributing Buprenorphine, he believes that the final product of the extensive sheet metal work he did at the plant was high-quality, met all the strict standards set by Boeing, and was not defective.[3]

Sommers understands the essence of Jones's testimony to be that the statistical differences in three different metrics of worker performance – absentee rates, days late,

---

[3] Moreover, one of the government's witnesses at the hearing in front of Judge Rice specifically testified that he had not heard of any allegations that errors by workers caused any crashes of Boeing aircraft. Tr. 7/23/12 at 10, 58 (testimony of David Bouse, Director of Human Resources for Boeing's Philadelphia site). In addition, Judge Rice found, in his opinion concerning the motions of several misdemeanor defendants for special probation, that FBI Agent Raymond Carr, who conducted an investigation at the plant from 2007 until 2011, testified that "he could not recall anyone at Boeing complaining of increased quality control problems or citing such concerns as a reason for initiating the investigation, and those issues were never the focus of his investigation." United States v. Duris, Crim.No.11-573, Mem. Op. at 6 (Aug 1, 2012) (attached).

accidents, and violations of company rules, *see* Jones Exhibit at 1-11 – between the group of all members of the plant of the United Auto Workers, on the one hand, and the group of all 37 defendants charged in this series of cases, on the other – indicated that the defendants, taken as a group, were more likely to have placed undue stress on the quality inspection ("redundancy") systems in effect at the Ridley plant. Based on this reasoning, Jones asserted that workers who abuse prescription medications create an increased risk of a manufacturing defect and, accordingly of an accident. *See also*, Duris, Mem. Op. at 8.

       Sommers cannot argue against the concept that the behavior at issue could conceivably lead to defective parts and then to harmful consequences. But, when placed in the context of the rest of his testimony, it is apparent that this risk was, under the circumstances, exceedingly small. As mentioned above, the government has provided no evidence that any defective parts ever made their way into any Boeing aircraft made at Ridley. Although the government seems to suggest – by including passages in its upward variance motion concerning crashes of aircraft – that distributions by the defendants, considered as a group, of prescription medications led to accidents, the government acknowledges that there is no such evidence. Gov. Motion at 11. At the hearing, Jones noted that there were quality control procedures, which he sometimes referred to as "redundancy," to ensure that no defective parts were installed in any aircraft. Tr. 7/23/12. at 166-67.

       Moreover, as far as he knows and as he understands from the government, Sommers' involvement in distributing illegal prescription medications was on a lower scale than was the conduct of some of the other defendants charged in this case. For example, when compared to two of the defendants who testified at the sentencing hearing in front of Judge Rice, Sommers' crimes were not as extensive. Steven Ellis testified that he had been a Boeing employee at the

plant and that he had 10-15 regular customers, Tr. 7/11/12 at 78-79, who purchased a total of approximately 30-60 pills a week, according to Judge Rice's calculation. Duris, Mem. Op. at 6. Jonathan Sullivan testified that he had been a Boeing employee and that he estimated that one out of four Boeing employees were on illegal pills. Tr. 7/11/12 at 93.

There is no doubt that the 53 Suboxone tablets sold by Sommers to the CS did not have an adverse impact on anyone, because it is apparent that the CS would have turned over to federal officials these 53 Suboxone tablets. On June 22, 2010, when the CS made his third purchase of Suboxone tablets from Sommers, this time in the amount of 22 tablets, the defendant told the CS that he got 20 Suboxone tablets each month from his doctor, and would have some of those available for sale the following month. Although the CS asked Sommers if he had Xanax or Oxycontin for sale, but the defendant said that he did not, but mentioned that another employee, Christopher Young might have access to such medications. FBI 302 of interview with CS on June 22, 2010 (attached). Compared to the extensive dealings described by Boeing workers Ellis and Sullivan, these are much smaller amounts.

Other than his three distributions to the CS, the only "relevant conduct" identified by the government was that Sommers' introduced to the CS to Young, that the CS understood that Young was the middle-man between Sommers and the CS, and that Young sold the CS 20 Suboxone tablets for $200. FBI 302 of interview with CS on June 11, 2010[4] (attached). Again, even attributing to Sommers the amount of this distribution, Sommers believes that he is on a lower scale than many of the other defendants.

---

[4] Sommers does not object to the government's relying on this relevant conduct, even though it was not included in the PSR, cf. PSR, ¶8-¶10, because he had been notified of it previously by the government.

It should be noted that, as to any sales by Sommers or by his co-worker Christopher Young to Boeing employees during the government's investigation at Boeing from 2007 to 2011, United States Attorney Zane David Memeger stated, according to an article in the Philadelphia Inquirer about this case, that "during the investigation, we took affirmative steps to coordinate with Boeing, to make sure that … mechanisms were in place at Boeing to ensure the quality and safety of the airplanes that were being constructed."[5]

## VII. <u>SENTENCING FACTORS UNDER SECTION 3553(a)</u>.

As stated by the Third Circuit Court of Appeals in <u>United States v. Levinson</u>, 543 F.3d 190, 195 (3d Cir. 2008), the district courts have a distinct role in the sentencing process. For the district courts, there is a "three-step sentencing procedure." 543 F.3d at 194 (citing <u>Gall</u> and <u>United States v. Gunter</u>, 462 F.3d 237, 247 (3d Cir.2006) (" <u>Gunter I</u>")). The first and third steps, which are relevant here,[6] are:

> [First, a] district court must begin the process by first calculating the applicable Guidelines range …. [Third,] after allowing the parties an opportunity for argument, the court must consider all of the § 3553(a) factors and determine the appropriate sentence to impose, which may vary from the sentencing range called for by the Guidelines.

543 F.3d at 194-95 (citations omitted).

Section 3553(a) provides:

> Factors to be considered in imposing a sentence.—
> The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—

---

[5] The link for the article is:
http://www.delcotimes.com/articles/2011/09/30/news/doc4e8530e62b779839026106.txt?viewm
ode=fullstory

[6] The second step, as to whether any departures were appropriate, is not applicable here, because the PSR identified no grounds for any departures under the guidelines.

The so-called parsimony provision, 18 U.S.C. § 3553(a), "requires the court to impose the least severe sentence necessary to satisfy the four purposes of sentencing – punishment, deterrence, protection of the public and rehabilitation." United States v. Cull, 446 F.Supp.2d 961, 962 (E.D.Wis. 2006); *see also*, Gall v. United States, 552 U.S. 38, 128 S. Ct. 586, 597 (2007). *See, generally*, Duris, Mem. Op. at 10-11.

One of the primary benchmarks for sentencing, in the wake of the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), which held that the Sentencing Guidelines were advisory rather than mandatory, is the substantive reasonableness of the sentence. *See, e.g.*, United States v. Kroshnev, 2013 WL 1768011 (3d Cir. 2013).

Based on the PSR, there is no possible inference that Sommers engaged in any transactions in prescription medications other than the ones described above. Keeping in mind the "four purposes of sentencing," the defendant argues that no useful purpose would be served by a sentence more stringent than a term of probation. When the court considers the first factor under section 3553(a) –

> (1) [T]he nature and circumstances of the offense and the history and characteristics of the defendant[.]

– there is no evidence of the "risk to society" argued by the government, or that the defendant has shown any proclivity to repeat the offenses with which he was charged here.

Likewise, when the court considers the second factor in section 3553(a), referred to above as the "four purposes of sentencing," the analysis should be the same:

> (2) [T]he need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

Sommers' offenses were limited in scope, as argued above. While any felony, such as the one here, is a serious offense, the defendant's limited involvement here does not suggest a sentence more stringent than probation.

Likewise, the other five statutory factors should not be weighed in favor of a more stringent sentence than probation:

> (3) [T]he kinds of sentences available[.]

> (4) [T]he kinds of sentence and the sentencing range established for ... the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines ...[.]

> (5) any pertinent policy statement ... issued by the sentencing commission ... [.]

> (6)[avoiding] unwarranted sentencing disparities[.]
> ....

> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. §3553(a).

## VIII. CONCLUSION

As a result of his delivery of controlled substances and his subsequent arrest he lost a good job that he held for 24 years, a good marriage of 18 years, a home that he and his wife were buying and which was subsequently foreclosed upon. He has used his entire retirement to support himself and his family following his discharge from Boeing.

Now, fully understanding, as a mature 51 year old, the impact of his crime he is now committed to remaining drug free, supporting his family and fulfilling his most cherished role as a father.

Accordingly Sommers requests that the Government's Motion for an Upward Variance

be denied and that he be sentenced to a term of probation of no more than three years, a minimal

fine consistent with his ability to pay a special assessment of $300.00.

Respectfully submitted,

/s/ Sara M. Webster
Sara M. Webster
PA Bar No. 30976
Mellon & Webster
87 North Broad Street
Doylestown, Pennsylvania  18901
(215) 348-7700
Facsimile (215) 348-0171
swebster@mellonwebster.com
Counsel for Defendant

/s/ Walter S. Batty Jr.
Walter S. Batty Jr.
Email: tbatty4@verizon.net
(610) 544-6791

Dated: July 26, 2013

## Certificate of Service

I hereby certify that on the 26th day of July, 2013, I electronically filed the foregoing

pleading with the Clerk of Court using the CM/ECF system, which will send a notification of

such filing (NEF) to the following:

Ashley Lukenheimer, AUSA
US Department of Justice
United States Attorney's Office
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106
Email: ashley.lunkenheimer@usdoj.gov


**And I hereby certify that I have Federal Expressed- Priority overnight the document to the following:**

Honorable C. Darnell Jones II
United States District Court for the Eastern District
of Pennsylvania, U.S. Courthouse
601 Market Street
Philadelphia PA 19106


/s/ Sara M. Webster
Sara M. Webster
PA Bar No. 30976
Mellon & Webster
87 North Broad Street
Doylestown, Pennsylvania 18901
(215) 348-7700
Facsimile (215) 348-0171
swebster@mellonwebster.com
Counsel for Defendant

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | |
| | : | |
| ANDY DURIS, | : | No. 11-cr-573 |
| | : | |
| JAMES SWAN, | : | No. 11-cr-580 |
| | : | |
| MICHAEL PATTERSON, and | : | No. 11-cr-582 |
| | : | |
| VICTOR PHILLIP. | : | No. 11-cr-583 |

**MEMORANDUM OPINION**

**TIMOTHY R. RICE**                                                                 **August 1, 2012**
**U.S. MAGISTRATE JUDGE**

As described by its own director of security, the Boeing Company's Ridley Park facility

was a mess five years ago.  Some work areas were openly littered with drug paraphernalia.

Special Agent Raymond Carr of the Federal Bureau of Investigation ("FBI") described

prescription drug abuse among Boeing workers as an "epidemic."  To make matters worse,

Boeing apparently was unable to negotiate a collective bargaining agreement with the United

Auto Workers Union ("UAW") that would have allowed it to randomly test employees for

prescription drug abuse on the job.[1]

All of this transpired while the United States was fighting a war on two fronts -- our

nation's most expansive military initiative since World War II.  As U.S. soldiers sacrificed their

lives in battle, Boeing workers -- some of whom were trafficking in, and abusing, prescription

drugs on the job -- were manufacturing some of the most sophisticated helicopter weaponry in

---

[1]This year, however, after the arrests made as a result of Agent Carr's investigation, the
local chapter of the UAW agreed to an expanded drug policy that includes testing for prescription
painkillers.

the world: the V-22 Osprey and the CH-47 Chinook.

Following a joint investigation by the FBI and the Drug Enforcement Administration, dozens of Boeing employees have been charged with, and many convicted of, either distributing or attempting to illegally possess prescription drugs at Boeing's Ridley Park facility between 2007 and 2011. As sentencing approaches for those convicted of attempted possession of illegal prescription drugs, defendants William Wallace Wilson, Andy Duris, Michael Homer, Jeffrey Lynn Forbes, Thomas Alfred Lees, Vincent Joseph Demsky, George Anthony Torres, III, James Swan, John Francis Shalkowski, Michael Patterson, Victor Phillip, and William Brian Summers seek special pre-judgment probation under 18 U.S.C. § 3607(a).[2] This unique statute allows first-time, misdemeanor drug offenders to obtain dismissal of the proceedings upon successful completion of a probationary term lasting up to one year.

The government has filed a blanket opposition to all § 3607 requests and urges me to exercise my broad discretion to deny special probation to all Boeing defendants for a variety of reasons, primarily the critical role the company and its employees play in our national defense. During a two-day hearing on the pending motions, the government offered testimony by eight witnesses, including Agent Carr, Boeing employees, and cooperating defendants who used and sold prescription drugs at the Ridley Park facility. Counsel agree that the requests of Duris, Swan, Patterson, and Phillip are now ripe for consideration.[3] For the reasons that follow, I will grant the requests of Duris and Phillip, but deny the requests of Swan and Patterson.

---

[2]Although Shalkowski has not filed a written motion invoking § 3607 yet, his counsel announced at recent change-of-plea hearings that he intends to do so.

[3]I will dispose of the remaining defendants' requests at sentencing, after hearing additional evidence specific to each of them.

Our nation has long struggled to reconcile its war-time patriotism and quest for national security with its need to safeguard individual liberty, due process, and a sense of fairness. See Boumediene v. Bush, 553 U.S. 723 (2008) (ruling Military Commission Act unconstitutional and granting Guantanamo Bay detainees habeas corpus privileges); Korematsu v. United States, 323 U.S. 214 (1944) (upholding order requiring Japanese-Americans in "military areas" on the west coast to evacuate their homes and submit to military control); Schenck v. United States, 249 U.S. 47, 52 (1919) (finding the right to free speech to be limited during World War I, reasoning "[w]hen a nation is at war many things that might be said in time of peace are such a hindrance to its effort that their utterance will not be endured"). As explained further below, a blanket denial of special probation to a class of defendants working in the defense industry is inconsistent with the principle of individualized sentencing. See 18 U.S.C. § 3553(a). This is especially critical here, because the government has offered little evidence that any individual offenders jeopardized national security by producing defective weaponry, or were cited for poor work performance at Boeing. The critical role of Boeing's work in our national defense is only one factor in the § 3607 determination; it cannot serve as a talisman that overrides the intent of Congress to afford first-time, misdemeanor drug offenders a rare opportunity for redemption.

I must consider the individual circumstances of each defendant in the larger context of drug abuse at Boeing. For example, some defendants became unwittingly addicted to pain medication following surgery or serious injury, have led otherwise crime-free lives, and performed years of unblemished service at Boeing. Their cases fall squarely within the heartland of what Congress envisioned when it enacted § 3607. Others, however, merit denial because they abused leadership positions at Boeing, sold drugs for profit, continued to offend after

3

receiving an opportunity for redemption through a state or local first-time-offenders program, or

refused to confront the serious nature of their crimes.

## FACTUAL BACKGROUND[4]

Like most companies, Boeing has a policy prohibiting the use, possession, and sale of

controlled substances and drug paraphernalia on its property.  Employees are subject to drug

testing based on "reasonable suspicion" and after involvement in serious accidents.[5]  Boeing does

not fire an employee after a positive drug test.  Rather, the worker receives a Compliance

Notification Memorandum placing conditions on his continued employment, which remain in

effect for three years and include drug treatment pursuant to a Substance Abuse Recovery Plan.[6]

Similarly, an employee facing termination based on attendance or work quality problems is

permitted to keep his job with Boeing if he voluntarily admits the problems stem from substance

abuse and successfully completes drug treatment.  In these instances, the company is aware of,

and monitors, the employee's treatment.

Boeing's drug policy also includes a generous Employee Assistance Program ("EAP"),

which permits workers to voluntarily, confidentially, and at the company's expense, seek

treatment for substance abuse issues.  An employee who avails himself of drug treatment through

---

[4]My factual recitation is based on the testimony of the government's witnesses at the evidentiary hearing held on Defendants' § 3607 motions on July 11 and 23, 2012.

[5]David Bouse, the Human Resources Director at the Ridley Park facility, testified about the drug policy.  He also explained that, before March 2012, the policy did not permit Boeing to test for prescription painkillers.  When asked why the company did not seek to negotiate with the UAW to amend the policy sooner and allow such testing, Bouse offered no satisfactory explanation.

[6]None of the four defendants whose § 3607 motions are ripe for disposition now were subject to Compliance Notification Memoranda at the time of their arrests.

4

EAP retains his job and may collect disability benefits -- also at the company's expense -- if he

seeks them.  Neither Boeing nor any future employers are made aware of the employee's problem

or treatment.  There is no limit on the number of times an employee may utilize EAP services.

Signs and posters designed to remind employees of the EAP and its purpose were included on

both Boeing and UAW billboards throughout the Ridley Park facility.

Robert Fasold, a former police detective, has been the director of corporate security at

Boeing's Ridley Park facility since 2003.  By 2005, based on tips from employees, a number of

on-the-job assaults and accidents, a scrap-metal theft problem, and drug paraphernalia he

recovered in work areas, Fasold suspected there was wide-spread drug abuse among workers at

the facility.[7]  In 2006, he asked UAW leadership for help addressing the problem.  When drug

abuse at Boeing persisted, Fasold sought assistance from the Delaware County District

Attorney's Office and, eventually, from the FBI.

Agent Carr, an experienced drug investigator, began investigating the use and sale of

illegal drugs at the Boeing Ridley Park facility in 2007.  After interviewing workers, developing

confidential informants, and setting up undercover purchases, Agent Carr identified

approximately two dozen individuals who were illegally selling oxycodone and fentanyl at the

facility.  Some of those individuals agreed to cooperate with the investigation.  They were asked

to wear audio and video recording devices and sell placebos drugs so that Agent Carr could

---

[7]The government presented photographs of paraphernalia Fasold recovered at the Ridley
Park facility, including a crack pipe, a bag of cocaine, prescription pill bottles, and wrappers and
sticks from fentanyl lollipops.

identify individuals who bought and used the illegal painkillers on the job.[8]  Despite the

"epidemic" nature of the drug problem at the Ridley Park facility, Agent Carr testified he could

not recall anyone at Boeing complaining of increased quality control problems or citing such

concerns as a reason for initiating the investigation, and those issues were never the focus of his

investigation.

Three sellers of illegal drugs who were identified, arrested, and charged as a result of

Agent Carr's investigation described the atmosphere at the Ridley Park facility during the years

leading up to their arrests.  Stephen Ellis testified that, after two years working at the facility, he

began getting painkillers from his friends so that he could sell them at work, because he

recognized there was "a market" for illegal prescription drugs among his Boeing coworkers.  He

sold to a total of about thirty customers, making between fifteen and twenty sales -- a total of

thirty-to-sixty pills -- each week.  According to Ellis, he observed visible, physical signs of on-

the-job drug use among his coworkers on a nearly daily basis.

Jonathan Sullivan testified he became addicted to prescription painkillers after having

dental surgery and experiencing a knee injury.  He recognized signs of the drug problem at

Boeing within his first week of training there in 2009.  When he began illegally using painkillers,

he had little trouble discovering which coworkers used and sold them.  Over time, he went from

taking five-milligram pills once a day, to taking larger doses every four hours.  Although

prescription pain pills were the most commonly abused drug among his coworkers, he testified

he used cocaine at work once, and he knew other employees occasionally used marijuana,

---

[8]The twelve defendants seeking § 3607 probation were identified during this "reverse
buy" phase of the investigation.

cocaine, and nitrous oxide. Some employees also illegally used and sold suboxone. He

estimated twenty-five percent of the employees assigned to his work area during his shifts used

illegal drugs at work.

Sullivan sold pain pills to support his own habit, and also sometimes traded work for pills

-- i.e., he agreed to do another worker's tasks in addition to his own. According to Sullivan, he

was "Superman" when he was taking pills. He claimed he worked harder and faster, had more

energy, and had difficulty performing his duties only when he stopped taking pills and

experienced withdrawal. Sullivan had "not one iota" of concern about the quality of the work he

performed while using painkillers. In July 2011, however, Sullivan realized he had a drug

problem and took advantage of Boeing's EAP program. He testified he has been drug-free ever

since.

Charles Haux became addicted to prescription painkillers after taking them to treat a

broken thumb in 2006. Haux testified he bought, used, and sold illegal prescription drugs at the

Ridley Park facility. He used the drugs about three times each day in order to avoid suffering

painful withdrawal symptoms, and also made between five and ten sales each day. His

customers included Duris, Swan, Patterson, and Phillip. After he was identified as a seller by

Agent Carr, Haux agreed to cooperate with the investigation. During the course of his

cooperation, he sold placebo pills or lollipops to each of the four defendants at least once,

capturing each transaction on videotape. Haux testified he was an "excellent" employee, even

while using drugs on the job. When asked whether any of his supervisors ever expressed concern

about the quality of his work, Haux responded: "They loved me."

Dr. George Downs, a professor and Dean Emeritus of Philadelphia College of Pharmacy

at the University of the Sciences, testified as an expert in pharmacy with a specialty in substance abuse issues. According to Dr. Downs, abuse of opiates causes more deaths per year in the United States than car accidents. See also Timothy W. Martin, Bill Aims to Deter Painkiller Abuse, Wall St. J., July 19, 2012, at A6 ("[T]he nation's growing addiction to prescription painkillers . . . killed more people in 2011 than heroin and cocaine combined."). Dr. Downs opined that prescription drug abuse would not result in increased energy, strength, or efficiency. Even a person taking such drugs pursuant to a valid prescription would be required to restrict activities like driving and use of heavy equipment, because the drugs, like alcohol, alter perception. Dr. Downs was "not sure" whether a person under the influence of such drugs could function "normally" without a doctor to regulate dosage.

Finally, Obie Jones, the Director of Operations at three Boeing facilities, including Ridley Park, testified the employees who were arrested as a result of Agent Carr's investigation missed more work, were involved in more accidents, and received more corrective action memoranda from supervisors than similarly situated UAW workers in general. According to Jones, absences, accidents, and rule-breaking behavior reduce productivity. He admitted, however, he could not identify any specific production defect that was tied to the performance of any individual defendant. Like Bouse, Jones could not explain why Boeing was unable to negotiate a prescription drug testing policy with the UAW before 2012.

SPECIAL PROBATION STATUTE

Section 3607, also known as the Federal First Offender Act ("FFOA"), provides:

If a person found guilty of an offense described in section 404 of the Controlled Substances Act (21 U.S.C. 844)--

    (1)       has not, prior to the commission of such offense, been convicted of violating a Federal or State law relating to controlled substances; and

    (2)       has not previously been the subject of a disposition under this section;

the court may, with the consent of such person, place him on probation for a term of not more than one year without entering a judgment of conviction. At any time before the expiration of the term of probation, if the person has not violated a condition of his probation, the court may, without entering a judgment of conviction, dismiss the proceedings against the person and discharge him from probation. At the expiration of the term of probation, if the person has not violated a condition of his probation, the court shall, without entering a judgment of conviction, dismiss the proceedings against the person and discharge him from probation.

§ 3607(a). The FFOA permits first-time, misdemeanor drug offenders to avoid the harsh consequences of a federal criminal conviction. Its legislative history provides no insight into Congress' intent in enacting the statute, nor does it supply any guidelines for its application. See Gov't's Mem. Opp'n Defs.' Mots. Special Probation at 5, United States v. Wilson, No. 11-571 (E.D. Pa. July 10, 2012) [hereinafter Gov't's Br.] (quoting a Senate Report which essentially paraphrases the statute itself). Likewise, there is little relevant caselaw interpreting § 3607.[9] The parties have identified -- and my own research has revealed -- only one case in which a sentencing court conducted a written analysis of § 3607 under circumstances relevant here. In that case, the defendant sold more than 100 oxycodone pills to a government informant to raise money to pay for her grandmother's medical care. United States v. Castro, No. 10-711, 2012 WL 1174677, at *2 (S.D.N.Y. Apr. 9, 2012). The defendant had no criminal history, was employed

---

[9]A majority of the cases that discuss the statute do so in the context of immigration proceedings. See, e.g., Nunez-Reyes v. Holder, 646 F.3d 684 (9th Cir. 2011) (comparing effect of conviction later expunged under state first-time offender law with effect of expungement pursuant to FFOA for purposes of removal proceedings).

and pursuing education, engaged in no acts of violence, sold no drugs to civilians who would

have been harmed by them, and voluntarily ceased her criminal behavior. Id. at *3. She pleaded

guilty to possessing a controlled substance -- a misdemeanor -- and sought special probation

pursuant to § 3607. Id. at *1. The sentencing court considered the factors identified in 18 U.S.C.

§ 3553(a), and imposed nine months of special probation pursuant to § 3607. Id. at *2-3.

## GENERAL SENTENCING FACTORS

A sentencing court has broad discretion to fashion an appropriate sentence. See United

States v. Voelker, 489 F.3d 139, 155 (3d Cir. 2007). That discretion, however, must be guided

by the factors enumerated in 18 U.S.C. § 3553(a):

(1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)    the need for the sentence imposed--

    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)    to afford adequate deterrence to criminal conduct;

    (C)    to protect the public from further crimes of the defendant; and

    (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)    the kinds of sentences available;

(4)    the kinds of sentence and the sentencing range established [by the relevant sentencing guidelines] . . . ;

(5)    any pertinent policy statement [by the Sentencing Commission] . . .;

(6)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)    the need to provide restitution to any victims of the offense.

§ 3553(a); see also Castro, 2012 WL 1174677, at *1-3.

In addition to these enumerated factors -- or perhaps as a component of the first factor,

"characteristics of the defendant" -- I also will consider performance on pretrial supervision.

Each defendant has been supervised for ten months, and their compliance with the terms of their

supervision -- or lack thereof -- is probative of their amenability to probation in general, and special probation under § 3607 in particular.

## ANALYSIS

The parties agree Duris, Swan, Patterson, and Phillips are eligible for § 3607 relief: all have been found guilty of misdemeanor drug offenses; none have been convicted previously of a drug offense under federal or state law; and none have received probation pursuant to § 3607 before.  The parties also agree I am not bound to grant special probation to any defendant simply because he meets these eligibility requirements.  Instead, I must consider the same factors that are relevant to any sentencing determination to assess whether § 3607 probation is appropriate for each individual defendant.  See United States v. Gonzalez, 365 F.3d 796 (9th Cir. 2004) (where defendant met statutory criteria, sentencing court properly applied preponderance-of-the-evidence standard to find defendant intended to sell the drugs he possessed, and denial of § 3607 probation was not an abuse of discretion).

I.    Duris

Duris worked for Boeing as a composite fabricator for nearly thirty years.  He was a union committeeman and shop steward.  The government suggests I should deny his request for § 3607 probation because he was temporarily terminated from his position in 1983 for falsifying company time records, and because he received a one-day suspension without pay in 2007 for "leaving a full piece of backing in a lay-up."  See Gov't's Br. at 19-20.[10]  I disagree.

Duris is an ideal candidate for special probation.  Haux testified Duris bought "a couple"

---

[10]The government does not explain what the terms "backing" or "lay-up" mean, and the record before me contains no further description of Duris' 2007 infraction.

pills from him about once a week, for less than one year. Duris was arrested after he was recorded once buying placebo pain pills from Haux. The transaction itself was unremarkable, aside from the fact it took place on Boeing property. There is no evidence Duris used the pills at work -- either in connection with the recorded transaction, or on any other occasion. Similarly, there is no evidence he ever sought or used other controlled substances. Although Duris had a 24% absence rate,[11] he received no write-ups for attendance or other infractions, and incurred no recordable injuries during the course of the investigation. He also has satisfied all conditions of his pretrial supervision, reporting as required and consistently testing negative for controlled substances. Accordingly, I will grant Duris' motion pursuant to § 3607.

II.    Swan

Swan was hired by Boeing in 2009 as a composite fabricator. The government has offered several specific reasons why special probation is not an appropriate disposition for Swan, and I will exercise my discretion to deny his request pursuant to § 3607 for the following reasons.

In 2009, Swan received the benefit of a state diversion program for first-time offenders following his arrest for driving under the influence and causing an accident. Although his participation in that program does not statutorily disqualify him for § 3607 probation, the spirit of the FFOA is not served by allowing an individual to escape the consequences of a criminal conviction for a second time.

---

[11]The average absence rate for all union workers at the Ridley Park facility was 17.4%. However, the government's evidence of the defendants' absenteeism is of limited value. The data used to calculate the rates included as "absences" all of the following: unexcused absences, approved vacation or sick days, late arrivals, and other partial-day absences. Jones, who compiled the data, admitted he did not account for many relevant factors, including the amount of vacation time an individual had accrued based on seniority, the reason for the absence, and the amount of time missed on any given day.

Moreover, the evidence reveals Swan purchased placebo pills from Haux three times in a single day.  Haux also testified Swan previously sold him steroids at the Ridley Park facility. Swan was written up twice in the past two years -- once for attendance problems, and once for breaking a rule and causing a work delay.[12]  He also logged a recordable injury in April 2010.[13]

Finally, although Swan has reported as required during his pretrial supervision, he has tested positive for opiates numerous times, including once after he completed inpatient drug treatment.  Based on his prior diversion opportunity, the extent of his drug activity at Boeing, and his continued use of drugs while on pretrial supervision, I will deny Swan's motion for § 3607 probation.

III.    Patterson

Patterson began working at Boeing in 1985.  During the years of the investigation, Patterson was an inspector in operational support, and also served as the UAW president at the facility from March 2010 to January 2011.  His abuse of illegal drugs while holding leadership positions at Boeing is one of several factors justifying denial of Patterson's request for special probation.

In 1992, Patterson benefitted from a first-time-offender diversion program in New Jersey state court after being arrested for marijuana possession.  As discussed above with respect to Swan, this fact removes Patterson from the intended reach of the FFOA.

Haux testified Patterson was his customer for two years, buying prescription painkillers,

---

[12]Swan's absence rate during the relevant time period was 31%.

[13]This fact alone, however, would not merit denial of Swan's motion.  Some defendants began using illegal painkillers after work-related injuries, so it is unclear whether a defendant's recordable injury caused, or was caused by, prescription drug abuse.

marijuana, and suboxone. Patterson was videotaped buying pain pills and fentanyl lollipops from Haux three times in September 2011, and in one videotape, he is shown consuming a fentanyl lollipop at work immediately after purchasing it. Haux testified he used drugs with Patterson on other occasions both on and off work property, and he characterized Patterson's addiction as "getting bad" in 2011. In one of his recorded transactions with Haux, Patterson discussed purchasing cocaine, mentioned two sources from whom he sometimes obtained it, and offered to provide Haux with "a taste" next time he bought some. These facts reveal the extent of Patterson's criminal activity and the depth of his addiction while working at Boeing.[14]

Patterson's performance on pretrial supervision generally has been satisfactory. He tested positive for marijuana after his arrest, but has completed a short inpatient detox program and attended outpatient drug treatment. All subsequent drug tests have been negative. Patterson also has submitted fourteen character letters from family, friends, and coworkers, all of whom cite positive contributions Patterson has made to their lives.

These mitigating factors, while noteworthy, do not outweigh Patterson's abuse of his leadership positions, the extent of his criminal activity, and his prior opportunity to avoid a criminal conviction for a drug-related offense. As such, I will deny his motion for § 3607 probation.

IV.    Phillip

Phillip, an Army veteran, worked as a composite fabricator at Boeing for twenty-five years. During that time, he received numerous awards and commendations for his positive

---

[14]Additionally, Patterson possessed oxycodone, which was obtained pursuant to a legal prescription, at the time of his arrest. His ability to obtain painkillers legally makes his decision to buy and use pain pills and other drugs illegally even more troublesome.

contributions to the company.  The government has cited no specific, individualized reasons to

deny Phillip's request for special probation.  Like Duris, Phillip is a good candidate for

disposition pursuant to § 3607.

Haux testified he sold illegal prescription drugs to Phillip for five years, and that the two

men sometimes used the drugs together while at work.  During the investigation, Phillip twice

bought placebo painkillers from Haux in transactions that were captured on video.[15]  Although

Haux testified Phillip also bought marijuana on occasion, there is no evidence he ever used it on

Boeing property.  Likewise, there is no evidence Phillip ever sold or distributed any drug.

Phillip's criminal behavior is mitigated by his service in the military and at Boeing, as

well as his active involvement in charitable causes.  See Def.'s Mem. Supp. Req. Pre-Judgment

Probation at 4 (describing Phillip's efforts to raise money for a Delaware County charity in

memory of his grandson, who died in 2008).  Further, he has performed well on pretrial

supervision, seeking voluntary treatment and submitting only negative drug tests.  Accordingly, I

will grant Phillips' request for special probation.

V.      Conditions of Special Probation

My discretion to place conditions on a defendant's term of special probation is as broad

as my discretion to grant a request for such probation.  Based on all of the facts and

considerations discussed above, I conclude Duris' and Phillip's terms of special probation shall

last one year, and shall be subject to the following conditions: 1) intensive, random drug testing;

2) drug treatment and counseling, as needed based on the assessment of the Probation Office; and

---

[15]Phillip had a recordable injury to his wrist in March 2011, and his absence rate was
38%.  For the reasons stated above, I have afforded little weight to these factors.  See notes 11,
13, supra.

15

3) 200 hours of community service in a program that assists military veterans or the families of active-duty servicemen and women.  The community service condition is important to ensure the defendants recognize the critical role they played, as Boeing employees, in supporting those men and women who have so nobly served our nation in wartime.

If Duris and Phillip do not violate these conditions, I will dismiss the proceedings against them without entering judgments of conviction, and discharge them from probation at the expiration of the one-year term.

An appropriate order follows.

FD-302 (Rev. 10-6-95)

### FEDERAL BUREAU OF INVESTIGATION

Date of transcription    6/24/2010

     The following is a summary of an audio/video recording between the Source and Richard Sommers.

     The Source related that he spoke with Sommers a few days prior to meeting him and Sommers related that he (Sommers) was going to the doctor to get some more Suboxone and wanted to know if the Source wanted to buy some. The Source told Sommers that he/she would need twenty (20). On 6/21/10 the Source told Sommers that they should meet in building 3-25 by Sommers shop. The Source told Sommers that the Source did not want to have to come and look for Sommers.

     Sommers was standing on the loading dock outside of building 3-25 when the Source arrived to meet him. The Source met Sommers by the Scale on the loading dock and they talked about weight lifting. Sommers got on the scale and weighed in at 308 pounds. They then walked back to the work area and talked to several other individuals that they work with.

     Sommers then handed the Source twenty-two (22) Suboxone tablets and the Source handed Sommers $200.00 dollars. The Source asked Sommers if he could get the Source some OxyContin and Sommers told the Source that they are hard to get. The Source then asked if Sommers had any Xanax available and Sommers stated no, but to check with Chris Young, because he may have some for you. Sommers told the Source that next month he will be getting some more Suboxone and will sell them to the Source.

---

Investigation on   6/22/10   at     Ridley, Pennsylvania

File # 209C-PH-104066 Sub T         Date dictated  6/24/10

by   SA Raymond J. Carr Calixto Vazquez:rjc

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302 (Rev. 10-6-95)

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    5/28/2010

      The following is a summary of an audio/video recording between the Source and Richard Sommers.

      The Source related that he spoke with Sommers on Thursday 5/27/2010 and Sommers related that he would have thirteen Suboxone tablets for the Source on Friday 5/28/2010. Sommers told the Source that he wanted to meet earlier, because of the holiday weekend. The Source agreed to meet Sommers on Friday morning.

      The Source received a telephone call from Sommers asking the Source to meet Sommers at the Wawa Store located at 1260 North Providence Road, Media, PA. When the Source arrives Sommers is in the Wawa waiting for the Source. Sommers exits the Wawa and enters the Source's vehicle. Sommers told the Source that he has only eleven (11) Suboxone tablets and not the thirteen (13) that he had promised. Sommers explained that the tablets he has are from another guy in the shop and that is what he gave to him (Sommers). The Source gave Sommers $110.00 dollars in United States currency and Sommers gave the Source the Suboxone tablets.

      The Source asked Sommers if he could deal directly with the other individual that gave him the tablets and Sommers said that he would introduce the Source to him next week. The Source asked Sommers about the contact that he mentioned that has the 80MG OxyContin tablets for sale and Sommers stated that he will talk to that person next week as well. Sommers told the Source that he could probably get the guy with the OxyContin to sell the 80MG tablets for $40.00 dollars apiece. Sommers related that this individual was originally asking for $50.00 dollars per tablet. The Source asked if this person was trustworthy and Sommers stated that he was and described this person as an old dude.

---

Investigation on   5/28/10   at     Media, Pennsylvania

File # 209C-PH-104066 Sub T            Date dictated  5/28/10

by   SA Raymond J. Carr:rjc

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302 (Rev. 10-6-95)

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription     5/25/2010

The following is a summary of an audio/video recording
between the Source and Richard Sommers.

The Source related that he spoke with Sommers on numerous
occasions about the purchasing of Percocet, OxyContin and Suboxone.
Sommers told the Source that he goes to his doctor once a month and
will sell the Source twenty Suboxone tablets on Tuesday, 5/25/10.
Sommers told the Source that he may sell the Source more later in
the week. The Source was told to come into Sommers work area
located in building 3-25 and they would conduct the deal there or
near the back door of building 3-25. Sommers told the Source that
he is not that concerned about selling in the open, because there
is no pressure on their area about drugs.

The Source walks into building 3-25 and up to Sommers
work station. Sommers handed the Source and an amber prescription
bottle filled with twenty orange colored tablets. The Source then
gives Sommers $200.00 dollars in U.S. currency and asked Sommers if
there were twenty pills in the bottle, Sommers replies yes.

The Source and Sommers talk about Sommers Doctor who is
treating Sommers for his addiction. Sommers tells the Source that
the first visit is $400.00 dollars and the medical plan pays for
the prescriptions. Sommers told the Source that it is cheaper to go
to the Doctor than to pay the prices on the street. Sommers told
the Source that there are some people on the second shift that are
selling OxyContin 80MG for $50.00 dollars per tablet. Sommers
stated that he doesn't need the pills that bad.

Sommers told the Source that he knows a guy who may be
willing to sell to the Source to recoup some of the money that he
spent to pay the Doctor. Sommers related that the OxyContin is not
as readily available as they once were. The source stated that his
doctor is ███████████████████████████████████████

| | | | |
|---|---|---|---|
| Investigation on | 5/25/10 | at | Ridley, Pennsylvania |
| File # | 209C-PH-104066 Sub T | Date dictated | 5/25/10 |
| by | SA Raymond J. Carr:rjc | | |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

FD-302 (Rev. 10-6-95)

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    6/15/2010

        The following is a summary of an audio/video recording
between the Source and Christopher Young.

        The Source related that he spoke with Richard Sommers on
Wednesday 6/9/2010 and Sommers introduced the Source to Christopher
Young. The Source related that Young was the middle man between
Young and the Source. The Source met Young inside of building 3-25
on the Boeing property and was told to come directly to Young when
Sommers was not available. The Source stated that Young agreed to
sell the Source Twenty(20) Suboxone tablets for $200.00 on
6/9/2010.

        On 6/11/2010 the Source entered building 3-25 and walked
around for approximately five minutes. The Source observed Young,
walked up to him and Young told the Source that he has been busy
all day. Young told the Source that he had the tablets out in his
van and had counted out the tablets earlier in the day. Young and
the Source then walk out to Young's van. The Source asked Young if
Young could get any Percocet or OxyContin tablets. Young tells the
Source that they are available, but Young hasn't bought them in
awhile. Young told the Source that OxyContin 80MG are selling for
$50.00 apiece.

        The Source was on the passenger side of the van when
Young handed the Suboxone tablets to the Source. The Source asked
Young, $200.00 for twenty (20) tablets and Young replies, yes. The
Source asked Young when he will be able to get more Suboxone and
Young tells the Source that he only gets the Suboxone once a month,
so the Source will have to wait.

---

Investigation on    6/11/10        at            Ridley, Pennsylvania

File #  209C-PH-104066 Sub T                        Date dictated  6/15/10

by    SA Raymond J. Carr, Calixto Vazquez:rjc

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.